Booth, Judge,
delivered the opinion of the court:
The plaintiff is an Illinois corporation, engaged in the canning business at Mount Carmel, Ill. On November 1, 1918, the St. Louis depot quartermaster of the Army forwarded to the plaintiff a circular proposal requesting bids for, among other subsistence stores, 204,908 cans of lye hominy. The circular contained specific reference to the national pure food law and a warning to the plaintiff that “no article will be purchased by the Quartermaster Corps which is objectionable under the above laws.” It also set forth the vitally important stipulation that “ deliveries must be equal to accepted samples or prescribed standards, and the purchasing officer shall make the determination in each case.” The plaintiff returned to the depot quartermaster its bid of 8 cents per can, accompanying the same with sample cans of hominy it proposed to furnish, in accord with the proposal. Presumably the depot- quartermaster, the purchasing officer, was satisfied with the offer and the samples, for the bid of the plaintiff was accepted. On November 22, 1918, the depot quartermaster issued and forwarded to the plaintiff purchase orders numbered consecutively from S-756 to S-760, inclusive. Upon the face of each of the said orders was a reference to “Item No. 233, Q. M. C. Form No. 120, of February 15, 1918.” The order so referred to reads as follows: “Hominy, lye: No. 3 cans, 24 to case, liquor to be clear, hominy to be well cleaned and free from black spots.”
The plaintiff on January 20, 1919, shipped 24,000 cans of the value of $1,920 to the zone supply officer at St. Louis. This shipment supplied the full quantity requisite under purchase order No. S-756. The shipment was received, accepted, and paid for.
On January 21, 1919, the plaintiff supplied the quantity required under purchase Order No. S-757 by shipping to Chicago, Ill., 18,140 cans of the value of $1,451.20, the entire consignment being received, accepted, and paid for. On January 29, 1919, the plaintiff, under purchase order No. S-758, shipped 24,000 cans to El Paso, Tex., and it was received, accepted, and paid for. On January 30, 1919, and after-wards, on February 6,1919, the plaintiff consigned a total of *350 51,600 cans to New Orleans, and these, like former shipments, were received, accepted, and paid for. Up to and including the last date the plaintiff had shipped 117,740' cans and received without complaint or protest from the Government officers, in payment therefor, the total sum of $9,419.20. On February 11 and 12, 1919, the plaintiff shipped 43,392 cans to Fort Sam Houston, Tex., and on March 21, 1919, shipped 12,048 cans to New Orleans. The zone supply officer at Fort Sam Houston, on March 6, 1919, wired the Director of Purchase and Storage at Washington the solid and liquid contents of the 43,392 cans received at the fort. The Washington office immediately notified the officer to reject the shipments, and on March 24, 1919, notified the plaintiff accordingly.
Following the receipt of this alleged accurate information and the peremptory order of rejection, the receipt of the information and rejection having taken place on the same-day, the Quartermaster General inaugurated an investigation. From 6 to 27 cans of hominy were secured from each shipment made, forwarded to Washington, and there submitted for examination and analysis to a captain in the Quartermaster Corps. The captain had not theretofore acquired expert knowledge as to the solid content of a No. & can of hominy, nor did he subsequently determine the minimum requirement until after he obtained through submission to and collaboration with several other officers that 22 ounces was the very least the hominy should weigh, exclusive of fluid content. No regulation of the pure-food department had ever so provided, and the fixing of the standard was accomplished exclusively as narrated. The department unhesitatingly adopted the standard, and in pursuance thereof proceeded to make deductions from the plaintiff’s contract price for the hominy upon the following basis: Relying upon the alleged shortage in the solid contents of from 6 to 27 cans out of 24,000 shipped to St. Louis, and fixing the same at 7 per cent per annum of the gross receipts, viz, 23,995 cans, a deduction of 7 per cent from the purchase price was made. This same course with varying rates of percentage was followed as to all the remaining shipments, *351 resulting in withholding from the plaintiff $1,667.67 of the total amount due him.
The plaintiff, in dire financial straits, agreed to settle the shipment rejected under purchase order No. S-560 for $583.92 less than the invoice price, thus making the final claim for which this suit was commenced total $1,073.40.
This case is to be determined by the provisions of the contract under which the sales were made. Obviously there is no stipulation in any paper making up the agreement fixing the quantity of hominy in each can. The defendant deduces a conclusion in justification of the deduction made, predicated upon an alleged violation and departure from the pure food law by the plaintiff. It ivas generous of the defendant to recite provisions of the pure food law in the proposal; but manifestly a proceeding wholly unnecessary. The pure food law is a law of the land, and it is hardly to be supposed that a corporation solely engaged in the canning industry was ignorant of its provisions; even so, the familiar presumption of knowledge of the law obtains. The plaintiff could not escape the consequences of its violation though not made a part of the contract. The law was passed to protect all citizens of the country and. not for the special benefit of the defendant. Giving to the terms of the contract in this respect their widest latitude, what are the consequences? “ No article,” it is said, “ will be purchased by the Quartermaster Corps which is objectionable under the above laws.” Who is to determine the fact of objectionableness? Surely no jurisdiction is conferred upon the Quartermaster General to determine the issue. The enforcement of the pure food law is committed to other sources. The edict of the Quartermaster’s Department is not sufficient alone to convict one of a violation of the law. The court has a fixed opinion that the guilt or innocence of one charged with a violation of law is a judicial question.
If, however, the contract is to be construed as an obligation of the plaintiff to furnish an article of food Avhich meets the requirements of the pure food law, there is no fact of record in the case which would warrant a conclusion that this was not done. Whatever else may be said, it is evident beyond disputation that the hominy delivered was not unfit *352 for human consumption. The defendant retained it and presumably has consumed it. At any rate, it was not returned to the plaintiff and no offer to do so made. No regulation or ruling of the Department of Agriculture has been cited on the subject of adulteration of canned hominy, except decision No. 144, wherein canned goods are to be deemed as adulterated containing brine, sirup, water, etc., in excess of the amount for their preparation and sterilization. The only decision as to deleterious excess of fluids over hominy promulgated in this case emanates from the purchaser of the hominy, and this same purchaser keeps the hominy as a desired article of food.
Aside from all this, however, is the controlling stipulation of the contract, “ deliveries must be equal to accepted samples or prescribed standards, and the purchasing officer shall make the determination in each case.” The findings show that the plaintiff submitted samples. They were accepted by the defendant, the hominy was purchased after their inspection, and the hominy delivered, so far as the record discloses, was the equalof the samples furnished. The purchasing officer at no time prescribed “ standards ” otherwise than in accord with the sample. The plaintiff was not advised as to “standards” until after nearly 118,000 cans had been delivered, accepted without question, and paid for. The only specification which confronted the plaintiff is found in “ Item No. 223, Q. M. C. Form No. 120, of February 15, 1918. * * * Hominy, lye: No. 3 cans, 24 to case, liquor to be clear, hominy to be well cleaned and free from black spots.” Not a can was rejected for failure to meet them.
We are not impressed with a contention that 204,908 cans of lye hominy may be considered as adulterated because in instances the percentage of solid and liquid content varies; nor are we convinced as to the correctness of the standard established by the purchaser, a standard of which the plaintiff was not advised, and more or less arbitrary in its ascertainment.
We believe the plaintiff entitled to judgment. The defendant accepted the hominy, still has what has not been consumed, and has arbitrarily partially condemned a vast amount of consumable food supply without authority given *353 so to do in the contract of sale. Judgment for the plaintiff for $1,073.40. It is so ordered.
Moss, Judge; Graham, Judge; Hay, Judge; and Campbell, Ohief Justice, concur.